IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| JENKA LAB, LLC and | ) | |
| BRONNIKOV CONSULTING, LLC | ) | |
| | ) | |
|     Plaintiffs | ) | |
| v. | ) | Case No.:  2:23-CV-0046-RWS |
| | ) | |
| GUANGZHOU CRAZY SOFTWARE | ) | |
| TECHNOLOGY CO., LTD., | ) | |
| | ) | |
| | ) | |
|     Defendants. | ) | |

## **VERIFIED COMPLAINT**

Jenka Lab, LLC ("**Jenka Lab**") and Bronnikov Consulting, LLC ("**Bronnikov**") (collectively, "**Plaintiffs**") files this Complaint against Defendants, Guangzhou Crazy Software Technology Co., Ltd. ("**Crazy Software**" and "**Defendant**") as follows:

## **INTRODUCTION**

1.

This is an anti-counterfeiting action against those who make, import, buy, distribute, and/or sell counterfeit versions of Plaintiffs popular amusement machines.

2.

Bronnikov is the owner of the exclusive rights to the software for the Jenka Lab gaming systems, specifically Aurora, Northern Light, Favorite Skill, Favorite Reels, Aurora Link, Northern Link and Nautilus ( collectively "**Jenka Lab Games**"), which includes a series of games, and is also the owner of multiple federal copyright registrations issued by the United States Copyright Office for the computer files and associated artwork used in its individual game titles, including individual game titles that are incorporated into the Jenka Lab suites popular amusement games, including the following:

- Number TX0009178903, obtained on September 18, 2022 for Bronnikov's Aurora 1 and Northern 1 game source code (the "**Aurora 1 and Northern 1 - game source code**").

- Number TX0009178913, obtained on September 18, 2022 for Bronnikov's Aurora 2 and Northern Light 2 game source code (the "**Aurora 2 and Northern Light 2 - game source code**").

- Number TX0009178910, obtained on September 18, 2022 for Bronnikov's Aurora 3 and Northern Light 3 game source code (the "**Aurora 3 and Northern Light 3 - game source code**").

- Number TX0009178905, obtained on September 18, 2022 for Bronnikov's Aurora 5 and Northern Light 5 game source code (the "**Aurora 5 and Northern Light 5 - game source code**").

- Number VA0002336457, obtained on January 5, 2023 for Bronnikov's Aurora Holiday Special game artwork (the "**Aurora Holiday Special – graphics**").

- Number TX0009178881, obtained on September 18, 2022 for Bronnikov's Link and Northern Link game source code (the "**Aurora Link and Northern Link - game source code**").

- Number TX0009217321, obtained on January 5, 2023 for Bronnikov's Aurora/ Northern Holiday Special game source code (the "**Aurora/ Northern Light Holiday special - source code**").

- Number TX0009217326, obtained on January 5, 2023 for Bronnikov's Favorite Link Skill and Reel game source code (the "**Favorite Link Skill and Reel - source code**").

- Number VA0002336497, obtained on January 5, 2023 for Bronnikov's Northern Light Holiday Special game artwork (the "**Northern Light Holiday Special - graphics**").

Hereinafter, the above copyrighted works will be referred to collectively as the "**Copyrighted Works**".

3.

For years, Jenka Lab has been the exclusive distributor of popular amusement machines created by Bornnikov, and the exclusive licensee and/or owner of the registered JENKA LAB and JENKA LAB design mark trademarks (collectively, the "Jenka Lab Marks").

4.

Defendants are counterfeiters buying, re-selling, and otherwise distributing counterfeit popular amusement machines.

5.

These counterfeit popular amusement machines mimic authentic products, but are poor-quality imitations the existence of which materially diminish the value of the authentic Jenka Lab games (the "Counterfeit Products").

6.

Bronnikov cannot verify the conditions under which Defendant's counterfeit goods are manufactured, stored and sold, meaning Plaintiffs risk the loss of the power to control the quality and relative safety of products sold under its brands by the ongoing infringement and counterfeiting described herein, causing irreparable harm.

7.

Defendant's counterfeiting is willful – that is, with knowledge of the products' counterfeit status, and the fact that counterfeit products are not "Distributed by Jenka Lab, LLC."

8.

Plaintiffs thus bring this action against Defendant for:

a.  Trademark infringement (Lanham Act, Section 32, 15 U.S.C. § 1114);

b.  False designation of origin, unfair competition, and trademark and trade dress infringement (Lanham Act, Section 43(a), 15 U.S.C. § 1125(a));

c.  Trademark Counterfeiting Under Sections 32, 34, and 35 of the Lanham Act, 15 U.S.C. §§(1)(b), 1116(d), & 1117(b)-(c);

d.  Copyright infringement (U.S. Copyright Act, 17 U.S.C. §§ 101 *et seq.*); and

e.  Misappropriation of Trade Secrets Pursuant to 18 U.S.C. § 1836(b).

9.

In addition, Jenka Lab brings ancillary claims related to its loss of sales and revenues from the sale of the software--i.e., the Copyrighted Works.  Jenka Lab serves as the exclusive distributor of the Copyrighted Works.

## PARTIES, JURISDICTION, AND VENUE

10.

Bronnikov is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Buford, Hall County, Georgia.  Bronnikov creates, designs, develops, and manufactures the software, 3-D artwork, and audiovisual effects for various electronic games in various markets, such as the skill-based redemption and electronic pull-tab markets.  Relevant to the claims raised herein, Bronnikov creates, designs, and develops the software, 3-D artwork, and audiovisual effects for certain electronic games of skill distributed by Jenka Lab and licensed for use in certain video game markets, specifically the Georgia Lottery's Coin Operated Amusement Machine ("**COAM**") market.

11.

Jenka Lab, LLC is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Buford, Hall County, Georgia. Jenka Lab designs,

develops, and distributes products for various board, nudge, skill, redemption, and amusement games markets.

<center>12.</center>

Guangzhou Crazy Software Technology Co., Ltd. is a Chinese based company with its principal place of business in Guangzhou, Guangdong, China. Upon information and belief Crazy Software operates in the United States through banking systems and other means of communication and business operations, including, but not limited to shipping products directly to Georgia and attendance at various trade shows. On further information and belief, Crazy Software is, among other things, an active participant in the unlawful and tortious acts described herein, including, without limitation, the unauthorized and illegal use of counterfeit, hacked, or pirated versions of the Copyrighted Works and the unauthorized and infringing use of Plaintiffs' trademarks.

<center>13.</center>

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, as Plaintiffs allege claims arising under the laws of the United States, including, but not limited to, federal copyright law.

<center>14.</center>

This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332(a), as the Plaintiffs and Defendant are citizens of different states and the claims asserted herein exceed $75,000.

<center>15.</center>

This Court has personal jurisdiction over Defendant because they transacted business and committed and directed the acts occurring herein in the State of Georgia, and Plaintiffs' claims

arise from those activities. Defendant shipped products containing counterfeit versions of the Copyrighted Works to Georgia.

16.

Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claim occurred in this District, and because a substantial part of the property that is the subject of this action is situated in this District.

## STATEMENT OF FACTS

### *Bronnikov's Business and its Intellectual Property*

17.

Since at least 2019, Bronnikov has invested millions of dollars in developing high-quality and reliable electronic games of skill.  Indeed, Bronnikov has hired a growing team of dedicated employees who develop from scratch all design and software components of Bronnikov's games in-house, while acting within the scope of their employment, including the games' source code, object code, 3-D and other artwork, static images, and other visual and audiovisual effects that help to make Bronnikov's games an enjoyable experience for the end-user.  In creating these products, Bronnikov did not copy any of the artwork, static images, or audiovisual effects from another game or a non-Bronnikov author.

18.

Bronnikov also has invested substantial time, effort, and resources in marketing its games to customers and providing top-level customer service to those customers who purchase Bronnikov's games.

19.

Bronnikov's games are well- known and widely-respected by its customers (e.g., the operators who purchase the games) and end-users (e.g., the individuals who play the games), each of whom have come to expect high-quality games and top-notch customer service from Bronnikov.

20.

By investing these resources over several years, Bronnikov has established itself as a global leader in the electronic gaming industry.  As a global leader, Bronnikov protects its business through proper protection, including registration, of its copyrighted works, protection of its trade secrets, and protection of its intellectual property, including through enforcement actions, such as this one, to ensure its rights and its intellectual property assets are not infringed or misappropriated.

21.

Indeed, in addition to the Copyrighted Works, Bronnikov owns multiple copyrights in and to the computer files associated with its video games.  Bronnikov actively protects its copyrighted works by having at least 9 active, registered copyrights surrounding its business and products.

22.

Bronnikov also takes commercially reasonable measures to ensure the confidentiality of its proprietary software, including the software associated with the Copyrighted Works.  In this regard, Bronnikov: (a) maintains and protects its source code as a trade secret; (b) takes steps to prevent end-users from accessing its source code through a process called "obfuscation;" and (c) actively protects the artwork used in its computer files and software, including the Copyrighted Works, by creating, registering, and maintaining its copyrights in both the static images and the audiovisual effects used in its software.

23.

Among its various products, Bronnikov has created, owns, and sells, its Jenka Lab Games, which games are comprised of software, both source code and object code, and artwork that make the Jenka Lab Games well-known in the marketplace and distinctive to Bronnikov.  The Jenka Lab Games' artwork includes both static images, as well as the audiovisual effects that connect those static images.

24.

The Jenka Lab Games, some of which are currently in their sixth generation and each comprising a different suite of five games, contain material wholly original to Bronnikov, and are copyrightable subject matter under the laws of the United States.

25.

Relevant to the instant dispute, Bronnikov owns federal registrations in the Copyrighted Works.  True and correct copies of the registrations for the Copyrighted Works are attached hereto as **<u>Exhibit 1</u>**.

26.

Bronnikov distributes its Jenka Lab Games, including the Copyrighted Works, in stand-alone gaming cabinets, or as independent software, sold through its exclusive distributor, Jenka Lab.  End-users purchase these cabinets or the software, and a particular version of the Jenka Lab Games, such as the Copyrighted Works, from Jenka Lab and then offer them for use by end-users including in the Georgia COAM market.

27.

Computer software, like the Jenka Lab Games, is comprised of source code and object code.  Source code is created by a computer programmer with a text editor and is readable by

humans.  Object code[1] is the output of a source code compiled into a machine code that contains a sequence of machine-readable instructions.

28.

With respect to the source code and object code associated with the Jenka Lab Games, Bronnikov creates the source code and saves it in multiple "library" files that are accessible only to employees who need access to them and who have executed a confidentiality agreement. Pursuant to the terms of this confidentiality agreement, Bronnikov's employees are prohibited from disclosing any information concerning Bronnikov's "confidential information," including source code.  This obligation survives the termination of any employee's employment with Bronnikov.

29.

Using a computer program known as a compiler, Bronnikov transforms these human-readable library files into machine-readable object code, which object code forms the basis for the executable file that launches each game.

30.

The compiler includes an obfuscation feature,[2] which allows Bronnikov to build redundancies into each version of its Jenka Lab Games to prevent tampering and reverse engineering of its source code.  Bronnikov obfuscated the source code for each of its Jenka Lab Games.

---

[1]  Object code is a series of 1s and 0s, and is generally only readable by machines.  While a human might be able to understand the patterns with enough study, doing so would take a significant amount of time.
[2]  Obfuscation is the deliberate act of creating object code with redundancies, so that it is even more difficult for humans to read and understand.

31.

A certain "library" file controls Bronnikov's activation mechanism ("**Activation Mechanism**").  The Activation Mechanism is responsible for determining whether the Jenka Lab Games are authentic.

32.

Bronnikov takes commercially reasonable measures to maintain its "library" files, including both its source code and its Activation Mechanism.  These "library" files are confidential and proprietary to Bronnikov and are maintained as trade secrets (together, the "**Source Code**").

33.

In particular, access to these "library" files is limited to employees who have a need to know the information and who have executed confidentiality agreements.

34.

Moreover, because Bronnikov obfuscates its Source Code, it is not generally known outside of Bronnikov and further allows Bronnikov to maintain its Source Code as a trade secret. Indeed, because Bronnikov obfuscates its Source Code, it would be very difficult for someone, even a sophisticated computer programmer, to re-create the exact logic used in the Source Code.

35.

Thus, Bronnikov's "library" files derive independent economic value by remaining secret. Indeed, Bronnikov's Source Code, and its secrecy, allows Bronnikov to maintain its competitive advantage in the marketplace.

*Jenka Lab's Business and its Intellectual Property*

36.

Jenka Lab, as the exclusive distributor, sells and distributes Jenka Lab Games. Through Jenka Lab, the Jenka Lab Games, including the Copyrighted Works, reach end-users, who, in turn, place the Jenka Lab Games in their respective places of business.

37.

In order to obtain the Jenka Lab Games, among others, and thus the Copyrighted Works, an individual or business must purchase the Jenka Lab Games directly from Jenka Lab or another legitimate reseller of the Jenka Lab Games, to whom Jenka Lab initially sold legitimate Jenka Lab games (e.g., Ivey Promotions out of Georgia and Great Lakes Amusement out of Wisconsin).

38.

Jenka Lab began using its JENKA LAB word mark and JENKA LAB design mark on January 8, 2020 and in use in commerce on July 21, 2020 in connection with gaming machines, namely, slot machines and video lottery terminals.

39.

On September 21, 2020, Jenka Lab filed an application to register the mark JENKA LAB (Registration No. 6400827) with the United States Patent and Trademark Office. The mark was registered with the Trademark Office on June 29, 2021 (the "**Jenka Lab Mark**"). A true and correct copy of the Certificate of Registration is attached hereto as **Exhibit 2**. The Jenka Lab Mark is valid and subsisting.

40.

On September 22, 2020, Jenka Lab filed an application to register the JENKA LAB design mark (Registration No. 6400828) with the United States Patent and Trademark Office. The mark

was registered with the Trademark Office on June 29, 2021 (the "**Jenka Lab Design Mark**"). A true and correct copy of the Certificate of Registration is attached hereto as **Exhibit 3**.  The Jenka Lab Design Mark is valid and subsisting.

41.

To promote its goods, Jenka Lab has used the JENKA LAB word mark and JENKA LAB design mark (collectively, "**Registered Marks**") in many ways including on its website at <jenkalba.com>, on social media sites via authorized promoters < facebook.com/photo?fbid=668530984978927&set=pb.100054660930664.-2207520000>, and on the game systems themselves to name a few.

### *Defendant's Infringement of the Copyrighted Works and the Mark*

42.

Plaintiffs, specifically Jenka Lab, participates in various trade shows around the country exhibiting their products, including the Jenka Lab Games, and supporting the gaming and amusement industry. One such trade show Jenka Lab frequents is the Amusement Expo International ("**AEI**"), sponsored by the American Amusement Machine Association ("**AAMA**") and the Amusement & Music Operators Association ("**AMOA**"). The 2023 AEI trade show is scheduled for March 27-30, 2023, in Las Vegas, Nevada.

43.

Plaintiffs, in anticipation of attending AEI reviewed the exhibitor list and specifically noted Crazy Software listed as an exhibitor with a reference to its website. A screenshot of Crazy Software's exhibitor description is as follows and can be found at https://www.amusementexpo.org/2023/Public/eBooth.aspx?IndexInList=7&FromPage=Exhibito rs.aspx&ParentBoothID=&ListByBooth=true&BoothID=107342 (last accessed March 1, 2023).



44.

Prior to the most recent screenshot taken of Crazy Software's Exhibitor page on March 1, 2023, the below screenshot was taken on December 6, 2023 reflecting Crazy Software's full company name and a different Alibaba website link reflected in the below:



45.

As part of its due diligence, Plaintiffs reviewed Defendant's website and learned that Defendants were in possession of and was selling and/or using unauthorized, counterfeit, pirated, or hacked versions of, at least, the Copyrighted Works, as well as other products owned and distributed by Plaintiffs, and allowing such counterfeit and unauthorized games to be sold and ultimately used and/or distributed by their customers (i.e., end-users) across the United States (the "**Illicit Games**").  Pirated software is the unauthorized use, copying, or distribution of copyrighted software and can take many forms, including the unauthorized, illegal access to protected software and/or reproducing or distributing counterfeit or otherwise unauthorized software. A screenshot of G-Kar's website showing the sale of Illicit Games is as follows:



46.

A screenshot of Crazy Software's website showing the sale of Illicit Games is as follows:



47.

After learning of Defendant's sale and/or use of Illicit Games, Plaintiffs exercised reasonable diligence and verified that such unauthorized use of pirated or counterfeit machines by Defendant was occurring and continuing.

48.

Further, upon Plaintiff discovering the Illicit Games and conducting follow-up research, Plaintiff sent a demand letter to W.T. Glascow, Inc. who was in charge of the event management, specifically booth spaces and sales, notifying them of Crazy Software's Illicit Games.

49.

Upon information and belief, the Illicit Games are the product of a third party, or Defendant, unpackaging, decompiling, and de-obfuscating Bronnikov's trade secrets. Using this process, the third parties or Defendant were able to gain access to Bronnikov's multiple "library" files, which contain Bronnikov's proprietary Source Code and trade secrets. In other words, the third parties or Defendant were able to misappropriate Bronnikov's trade secrets by undoing the

deliberate and intentional steps Bronnikov takes and had taken to prevent third parties from ascertaining Bronnikov's trade secrets.

50.

Upon information and belief, through these efforts, third parties or Defendant were able to bypass Bronnikov's validation logic by altering the Activation Mechanism and market and sell hacked versions of the Illicit Games.

51.

China is the world's leader in supplying counterfeit and pirated goods.  In 2020, China was the source of 83% (by value) of all counterfeit and pirated goods seized by U.S. Customs and Border Control.  *See* Michelle Toh, CNN  Business, "The US accuses Tencent and Alibaba of letting sellers traffic fake goods" (Feb. 18, 2022); *available at* https://www.cnn.com/2022/02/17/business/china-tencent-alibaba-notorious-markets-list-intl-hnk/index.html.

52.

As demonstrated in paragraphs 43-46, Defendant operates its business primarily through the Chinese e-commerce site, Alibaba.com. Chinese e-commerce websites are flooded with listings offering to sell counterfeit and pirated goods.[3]  Because of that, many of those sites appear on the USTR's Notorious Markets List.  *See* Yuka Hayashi, Wall Street Journal, "Alibaba, Tencent E-Commerce Sites Tagged by U.S. for Counterfeit Sales" (Feb. 18, 2022); *available at* https://www.wsj.com/articles/alibaba-tencent-e-commerce-sites-tagged-by-u-s-for-counterfeit-sales-11645113638.

---

[3] Alibaba is China's largest e-commerce company and has been called the Amazon of China. Alibaba runs several e-commerce platforms, including its namesake Alibaba.com, which is a site for connecting manufacturers and wholesalers—i.e., facilitating business-to-business sales.

53.

Further, Defendant also operates its business through various social media pages, including but not limited to a number of Instagram accounts.

54.

Defendant purchased and/or manufactured the Illicit Game(s) for the purpose of displaying them and offering them for sale for use by end-users across the United States and the world.  Upon information and belief, Defendant purchased and/or manufactured the Illicit Game(s) for only a fraction of the amount at which genuine games containing the Copyrighted Works, and in this instance the Copyrighted Works, cost, thereby increasing their profits. *See* Yuka Hayashi, Wall Street Journal, "Alibaba, Tencent E-Commerce Sites Tagged by U.S. for Counterfeit Sales" (Feb. 18, 2022); *available at* https://www.wsj.com/articles/alibaba-tencent-e-commerce-sites-tagged-by-u-s-for-counterfeit-sales-11645113638.  Moreover, Plaintiffs' profits have thereby decreased as a result of the Illicit Games.

55.

It is well known that "branded" products being sold on Chinese websites are rarely legitimate, licensed products.  More than one author warns of the dangers and the downside to businesses sourcing branded products from those sites.  For example, one blog post warns:

> When browsing on Aliababa.com you can find merchandise of all kinds and therefore ***you may end up buying products protected by intellectual property***.
>
> In order to purchase these items [as legitimate, licensed products], the manufacturer will need a special agreement with the [IP] holder and will then have to pay the fixed or ongoing fees for each [licensed] item [that the manufacturer sells].
>
> ***In China, most suppliers have no such [license] agreement***, but they still [sell] these products without the [IP] owner's approval.
>
> Let's take for example a shirt with Mickey Mouse on it, we all know that he is a Disney character and that therefore his image is protected

> by intellectual property and cannot be reproduced without the permission of the company.
>
> * * *
>
> ***Buying products [protected by] intellectual property is illegal and the fault lies with the importer, which is you.***
>
> Once stopped at customs, these products are seized and a fine is issued to the importer which could also incur more serious criminal consequences.
>
> The advice is to stay away from this type of products, and ***check*** with the patent directories ***that you can actually sell the products you chose***.

(Emphasis added) "Is Alibaba legit? How to avoid scams and buy your products safely; available at https://yakkyofy.com/blog/aliexpress-and-other-chinese-ecommerce-en/is-alibaba-legit-how-to-avoid-scams-and-buy-your-products-safely/.

56.

Defendant's Illicit Game(s) are nearly identical to the Copyrighted Works, in that they present the same game play and almost identical artwork. However, the Illicit Game(s) perform at slower speeds than the Copyrighted Works, and the artwork in the Illicit Game(s) present dimmer artwork than the Copyrighted Works. Additionally, the game boards that run the Illicit Games are designed completely different from Plaintiffs' genuine game boards.

***<u>The Illicit Games Infringe the Copyrighted Works and Registered Marks</u>***

57.

Bronnikov created, designed, and owns the audiovisual effects that tie together the artwork used in the Copyrighted Works, and in this instance the Copyrighted Works which effects depict a series of related images that, when shown in a sequence, impart an impression of motion and the expression fixed in motion.

58.

The Copyrighted Works are wholly original, and Bronnikov is the exclusive owner of all right, title, and interest in the Copyrighted Works and the owner of all the exclusive rights associated with those Copyrighted Works, including, but not limited to, the right to reproduce its software in copies and to distribute those copies to the public.

59.

Defendant has published and publicly displayed unauthorized, unlicensed, and counterfeit reproductions of the Copyrighted Works, without Bronnikov's authorization, consent, or knowledge, and without any compensation to Bronnikov. In particular, Defendant has published and publicly displayed unauthorized, unlicensed, and counterfeit versions of the Copyrighted Works each time consumers buy and play their Illicit Game(s).

60.

As a result of Defendant's willful actions, Bronnikov has been damaged, and continues to be damaged, by the unauthorized publication and public display of counterfeit versions of the Copyrighted Works.  Defendant has never accounted to or otherwise paid Bronnikov for its improper, illegal, and unauthorized use of counterfeit versions of the Copyrighted Works.

61.

Defendant's acts are causing, and, unless restrained, will continue to cause, damage and immediate irreparable harm to Bronnikov for which Bronnikov has no adequate remedy at law.

### ***The Illicit Games Infringe the Source Code***

62.

Bronnikov considers its Source Code confidential information and a trade secret and has taken reasonable steps to keep its Source Code secret.

63.

Defendant purchased the Illicit Game(s), which actually misappropriated Bronnikov's Source Code.

64.

Defendant's actions, including Defendant's use, marketing, and/or selling of the Illicit Game(s), also misappropriates Bronnikov's Source Code.

65.

Defendant's foregoing actions, including the improper access to and use of Bronnikov's Source Code, was done without Bronnikov's permission.

66.

Defendant's acts are causing, and, unless restrained, will continue to cause, damage and immediate irreparable harm to Bronnikov for which Bronnikov has no adequate remedy at law.

67.

Defendant's acts have caused, and will continue to cause, Bronnikov to lose profits.

### ***Defendant's Impact on Bronnikov and Jenka Lab***

68.

Jenka Lab is Bronnikov's exclusive distributer of Jenka Lab Games.  Jenka Lab sells Jenka Lab Games to end-users, who, in turn, use them in their places of business.

69.

Before Defendant began offering and displaying the Illicit Games, consumers associated any Jenka Lab Game with Jenka Lab and Bronnikov.

70.

Defendant's Illicit Games are similar in every way to authentic Jenka Lab Games sold and distributed by Jenka Lab.

71.

Consumers likely will associate Defendant's Illicit Games with Bronnikov and Jenka Lab because, *inter alia*, Defendant's Illicit Games mimic in every way the experience provided by the Jenka Lab Games.

72.

Defendant has engaged in an unfair method of competition and unfair trade practice.

73.

Defendant's acts are causing, and, unless restrained, will continue to cause, damage and immediate irreparable harm to Bronnikov and Jenka Lab for which Bronnikov and Jenka Lab have no adequate remedy at law.

## COUNTS
### Count I
### Infringement of Jenka Lab's Federally Registered Marks (15 U.S.C. §1114)

74.

Plaintiffs repeats, realleges and incorporates the allegations in the paragraphs above as if fully set forth herein.

75.

The Jenka Lab Registrations for JENKA LAB and the JENKA LAB design mark are valid and subsisting, and are *prima facie* evidence of the validity of the Jenka Lab Marks, of Janke Lab's ownership of the Jenka Lab Marks, and of Jenka Lab's exclusive right to use the Jenka Lab Marks for the goods enumerated in the Janke Lab Marks Registrations, including but not limited to

gaming machines, namely, slot machines and video lottery terminals. By virtue of the Jenka Lab Marks Registrations, the Jenka Lab Marks are entitled to protection under the Lanham Act, 15 U.S.C. §§ 1051, et seq.

76.

In violation of 15 U.S.C. § 1114, Defendant used in commerce, without Jenka Lab's consent, either a reproduction, counterfeit, copy or colorable imitation of the Jenka Lab Marks on and in connection with the sale, offering for sale, distribution, or advertising of counterfeit Jenka Lab works (the "Infringing Marks"), which use is likely to cause confusion with Defendant and Jenka Lab, or to cause mistake, or to deceive consumers.

77.

Defendant's actions – most significantly, their refusal to stop use of the Infringing Mark (as described above) -- demonstrate that their infringement is intentional, willful, and malicious; Defendant is clearly trading on the goodwill associated with Jenka Lab's Registered Marks.

78.

As a direct and proximate result of Defendants' willful misconduct, Janka Lab has suffered irreparable harm to the value and goodwill associated with the Jenka Lab Trademarks, and to Jenka Lab's reputation in the industry. Unless the Defendant is restrained and enjoined from further infringement of the Jenka Lab Trademarks, Jenka Lab will continue to be irreparably harmed.

79.

As a direct and proximate result of Defendants' willful misconduct, Jenka Lab has suffered lost sales.

80.

Jenka Lab has absolutely no remedy at law that could compensate it for the continued, irreparable harm that is will suffer if the Defendant's willful misconduct is allowed to continue. Accordingly, Jenka Lab seeks, and is entitled to, both preliminary and permanent injunctive relief.

81.

As a direct and proximate result of Defendant's willful misconduct, Jenka Lab also has suffered damages to the valuable, registered Jenka Lab Trademarks; to its reputation among U.S. Consumers; to the goodwill associated with the Jenka Lab Trademarks and brands; and other damages in an amount not yet known, but to be proven at trial. Jenka Lab is also entitled to statutory damages, enhanced damages, and/ or its reasonable attorneys' fees.

## Count II
## Jenka Lab and Bronnikov - Trademark Infringement, False Designation of Origin and Unfair Competition Under Lanham Act § 43(a) (15 U.S.C.A. § 1125)

82.

Plaintiffs repeat, reallege and incorporate the allegations in the paragraphs above as if fully set forth herein.

83.

Jenka Lab is Bronnikov's exclusive distributor of Bronnikov's Games, which games are sold by Jenka Labs as either software boards or in freestanding gaming cabinets.

84.

Defendant has marketed, publicly displayed, presented, and offered for use to consumers their Illicit Games, which mimic the Copyrighted Work, in interstate commerce.  The Illicit Games were neither authorized, created, sold, licensed, sponsored, nor distributed by Plaintiffs.

85.

Defendant is passing off its Illicit Games as those authorized, created, licensed, sold, and/or distributed by Plaintiffs.

86.

Defendant's Illicit Games are likely to cause confusion with Defendants and Jenka Lab, mistake, or deception of the consuming public as to the origin, source, sponsorship, or affiliation of their Illicit Games.  Actual and potential consumers, upon encountering Defendant's Illicit Games, are likely to mistakenly believe that Defendant's Illicit Games originate with, or are sold, licensed, approved, sponsored by, or otherwise affiliated with Plaintiffs.

87.

By their unauthorized conduct, use of counterfeit copies of the Copyrighted Works, and unauthorized use of Plaintiffs' trademarks, Defendant has engaged in unfair competition with Plaintiffs, false designation of origin, and misleading description and representation of fact in violation of the Lanham Act, 15 U.S.C. § 1125(a).

88.

Upon information and belief, Defendant's actions have been, and continue to be, willful and with the intent to profit from the goodwill established by Plaintiffs in the Games. Defendant's actions are intended to cause confusion with Defendant and Jenka Lab, mistake, or deception as to the affiliation, connection, or association of Defendant with Plaintiffs.

89.

Bronnikov and Jenka Lab are entitled to an award of actual damages, Defendant's profits, enhanced damages and profits, reasonable attorneys' fees and costs, under 15 U.S.C. §§ 1116-17, as well as pre- and post-judgment interest.

90.

Defendant's conduct is causing immediate and irreparable harm and injury to Bronnikov and Jenka Lab, and to their goodwill and reputation, and will continue to both damage Bronnikov and Jenka Lab and confuse the public unless enjoined. Bronnikov and Jenka Lab have no adequate remedy at law. Bronnikov and Jenka Lab are thus entitled to a temporary restraining order, preliminary injunction, and permanent injunction.

**<u>Count III</u>**
**<u>Jenka Lab – Trademark Counterfeiting Under Sections 32, 34, and 35 of the Lanham Act,</u>**
**<u>15 U.S.C. §§(1)(b), 1116(d), & 1117(b)-(c)</u>**

91.

Plaintiffs repeat, reallege and incorporate the allegations in the paragraphs above as if fully set forth herein.

92.

Without Jenka Lab's authorization or consent, and having knowledge of Jenka Lab's well-known and prior rights in Jenka Lab's Marks, Defendant has knowingly and willfully facilitated, financed, and participated in the distribution, advertisement, offering for sale, and/or sale of Counterfeit Products to the consuming public in direct competition with Plaintiffs, in or affecting interstate commerce, and/or acted with reckless disregard to the rights of Plaintiffs in Jenka Lab's Marks in participating in such activities.

93.

The Counterfeit Products that are offered and sold to the public by way of the Alibaba marketplaces and other services reproduce, counterfeit, copy, and colorably imitate the Jenka Lab Marks or display spurious designations that are identical with, or substantially indistinguishable from, Jenka Lab's Marks. Defendants have thus caused reproductions, counterfeits, copies, and

colorable imitations of Jenka Lab's Marks to be applied to labels and advertisements to be used in commerce in connection with the sale and distribution of Counterfeit Products through the Alibaba marketplaces and other services, which is likely to cause confusion, to cause mistake, or to deceive.

94.

Defendant's participation, financing, and/or facilitation of this unauthorized use of Jenka Lab's Marks on or in connection with the Counterfeit Products was done with notice and full knowledge that such use was not authorized or licensed by Plaintiffs. Defendant's actions constitute willful counterfeiting of Jenka Lab's Marks in violation of 15 U.S.C. §§ 1114(1)(b), 1116(d), and 1117(b)-(c).

95.

As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered damage to their valuable Jenka Lab Marks, and other damages in an amount to be proved at trial.

96.

Plaintiffs do not have an adequate remedy at law, and will continue to be damaged by Defendant's facilitation of and participation in the sale of Counterfeit Products unless this Court enjoins Defendant from such fraudulent business practices.

**Count IV**
**Bronnikov – Misappropriation of Trade Secrets Pursuant to 18 U.S.C. § 1836(b)**

97.

Plaintiffs repeat, reallege and incorporate the allegations in the paragraphs above as if fully set forth herein.

98.

Bronnikov's confidential information includes trade secrets and/or other proprietary information that derives independent economic value from not being known to, and not being

readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

99.

Bronnikov's confidential and trade secret information has been and continues to be the subject of reasonable measures to keep such information secret.

100.

Defendant misappropriated such confidential and trade secret information of Bronnikov in connection with the distribution and sale of the Illicit Games.

101.

Defendant, at the time of use, knew, or had reason to know the Illicit Games and the confidential and trade secret information used to create the Illicit Games were derived from or through a person who had utilized improper means to acquire such information.

102.

As a result of Defendant's misappropriation, Bronnikov has been and continues to be damaged and irreparably injured, including, without limitation, the loss of sales and profits it would have earned but for Defendant's actions, and damage to Bronnikov's reputation among potential and existing customers, business partners, investors, and in the industry in general.

103.

Defendant's misappropriation is willful and malicious and thereby entitles Bronnikov to an award of exemplary damages.

104.

Defendant's misappropriation of Bronnikov's confidential and trade secret information has caused and will continue to cause Bronnikov irreparable and substantial injury and, therefore,

cannot be fully redressed through damages alone. An injunction prohibiting Defendant from further use or disclosure of Bronnikov's confidential and trade secret information is necessary to provide Bronnikov with complete relief.

<u>**Count V**</u>
<u>**Bronnikov – Federal Copyright Infringement (17 U.S.C. §§ 101 et seq.)**</u>

105.

Plaintiffs repeat, reallege and incorporate the allegations in the paragraphs above as if fully set forth herein.

106.

The Copyrighted Works are graphic designs and source containing copyrightable subject matter for which copyright protection exists under the Copyright Act, 17 U.S.C. §§ 101, *et seq.*

107.

Bronnikov is the exclusive owner of all exclusive rights under copyright in the Copyrighted Works.  Bronnikov owns valid copyright registrations, issued by the United States Copyright Office, for the Copyrighted Works.  <u>***See* Exhibit 1**</u>.

108.

The Copyrighted Works were created in-house by Bronnikov employees acting within the scope of their employment.  None of these employees have any contractual rights to ownership of the Copyrighted Works, and as such the Copyrighted Works constitute works made for hire.

109.

Currently, and at all relevant times, Bronnikov has been the sole owner of all right, title, and interest in and to the Copyrighted Works.

110.

The Copyrighted Works were registered within five (5) years of the first publication of the Copyrighted Works.

111.

By making the Illicit Games available for use by end-users, Defendant has publicly displayed and published pirated, hacked, and/or counterfeit copies of the Copyrighted Work, and have done so without Bronnikov's permission.

112.

Upon information and belief, Defendant's infringing conduct was, and continues to be, willful, with full knowledge of Bronnikov's interest in the Copyrighted Works, and specifically the Copyrighted Work.

113.

As a direct and proximate result of Defendant's willful, and continuing, infringement of Bronnikov's Copyrighted Works, and pursuant to 17 U.S.C. § 503(a), this Court "may order the impounding . . . (A) of all copies or phonorecords claimed to have been made or used in violation of the exclusive right of the copyright owner; . . . (C) of records documenting the manufacture, sale, or receipt of things involved in any such violation, provided that any records seized under this subparagraph shall be taken into the custody of the court."

114.

As a direct and proximate result of Defendant's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 for each work infringed with respect to Defendant's infringing use of the Copyrighted Works, and specifically the Jenka LabCopyrighted Work, or such other amount

as may be appropriate under 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Defendant's profits from the infringements, in an amount to be proven at trial.

115.

In all events, Defendant's acts are causing, and, unless restrained, will continue to cause, damage and immediate irreparable harm to Bronnikov for which Bronnikov has no adequate remedy at law.  Bronnikov is thus entitled to impoundment of the Illicit Games, a temporary restraining order, preliminary injunction, and permanent injunction.

## Count VI
## Bronnikov – Contributory Copyright Infringement

116.

Plaintiffs repeat, reallege and incorporate the allegations in the paragraphs above as if fully set forth herein.

117.

Defendant has no authorization, permission, license, or consent to use and/or utilize and exploit the Copyrighted Works in the Illicit Games at issue.

118.

Defendant had knowledge the Illicit Games are unauthorized, pirated, hacked, and/or counterfeit copies of, among others, the Copyrighted Works.

119.

Defendant materially contributed to the continued infringement of Bronnikov's Copyrighted Works by continuing to provide the Illicit Games in commerce.

120.

The foregoing acts of infringement by Defendant have been willful, intentional, and purposeful, in complete disregard of Plaintiffs' rights.

121.

As a direct and proximate result of Defendant's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 for each work infringed with respect to Defendant's infringing use of the Copyrighted Works, or such other amount as may be appropriate under 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Defendant's profits from the infringements, in an amount to be proven at trial.

122.

Plaintiffs are also entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

**Jury Demand**

123.

Plaintiffs demand a trial by jury for all issues so triable.

**Prayer For Relief**

WHEREFORE, Plaintiffs request the following relief against Defendant:

A.    That Defendant and its agents, servants, employees, attorneys, successors, and assigns, and any and all persons acting in concert or participating with it, or any of their successors or assigns or any of them, be preliminarily and permanently enjoined and restrained from directly or indirectly:

(a)    using the marks "JENKA LAB", "JENKA LAB design mark", or any other reproduction, counterfeit, copy, confusingly similar variant, or colorable imitation of the Jenka Lab Marks, in commerce in any medium;

(b)    advertising, marketing, offering for sale, providing or selling the Counterfeit Products;

(c)    using the Infringing Marks, or any reproduction, counterfeit, copy, confusingly similar variant or colorable imitation of the same, in any manner likely to cause others to believe that Defendants' services are connected with Plaintiffs or are genuine Plaintiffs-licensed products or services;

(d)    committing any other acts that may cause the consuming public to believe that Defendant's goods and/or services are genuinely licensed by Plaintiffs or otherwise provided for the benefit of Plaintiffs;

(e)    engaging in unfair and deceptive trade practices against Plaintiffs;

(f)     shipping, delivering, holding for sale, importing, distributing, returning, transferring, or otherwise moving or disposing of any materials falsely bearing the Infringing Marks, or any other reproduction, counterfeit, copy, confusingly similar variant or colorable imitation of the Jenka Lab Marks; and

(g)    assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above subparagraphs (1) through (7).

B.    That Defendants and any and all persons controlled by or acting in concert with it be required to deliver to Jenka Lab for destruction all goods, packages, and any other written or printed materials, in tangible or intangible form, that bear or depict the Infringing Mark, or any other reproduction, counterfeit, copy, confusingly similar variant or colorable imitation of the

Jenka Lab Marks.

C.       That Defendant be required to account for and pay to Jenka Lab Defendant's profits from sales of the infringing services and any other product or service incorporating, copying, or imitating the Jenka Lab Marks or any other brand element of Jenka Lab, or sold under the infringing mark, and such sum in addition thereto as the Court shall find just.

D.       For judgment that Defendant, Guangzhou Crazy Software Technology Co., Ltd.:

(a)     has violated the Copyright Act, 17 U.S.C. §§ 101, *et seq.*;

(b)     has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and

(c)     has violated 18 U.S.C. 1836(b).

E.       That an Order of Impoundment be entered pursuant to 17 U.S.C. § 503(a) directing the United States Marshal for the Northern District of Georgia to impound from Defendant, Guangzhou Crazy Software Technology Co., Ltd., and each of its officers, employees, agents, attorneys, and representatives, and all other persons, firms, or corporations in active concert or privity or in participation with Defendant, all products, advertisements, promotional materials, packaging, and other items in their possession or under their control bearing the Copyrighted Works, or any simulation, reproduction, counterfeit, copy or colorable imitation thereof.

F.       That Defendant and its officers, employees, agents, attorneys, and representatives, and all other persons, firms, or corporations in active concert or privity or in participation with Defendant, immediately deliver to the Court for impoundment the Illicit Games violating Plaintiffs Copyrighted Works, together with an accounting, to be provided to Plaintiffs, of: (1) the number of such Illicit Games in Defendant's possession, custody, or control; (2) where each Illicit Game was found; (3) the identity of the individual or individuals having possession, custody or control of each Illicit Game at the time it was found; and (4) a sworn explanation of how each Illicit Game

was obtained, duplicated, or distributed, including the identity of all persons involved in such activity for each Illicit Game.

G.      That this case be found exceptional and Plaintiffs be awarded their attorneys' fees pursuant to 15 U.S.C. § 1117(a) and/or other applicable law.

H.      That Plaintiffs recover the damages arising out of Defendant's wrongful acts in a sum equal to three times the actual damages suffered by Plaintiffs, as provided in 15 U.S.C. § 1117(b) and/or other applicable law.

I.      That Defendant be required to disgorge its profits and other ill-gotten gains pursuant to 15 U.S.C. § 1117(a) and other applicable law.

J.      That Plaintiffs have and recover the taxable costs of this civil action, including reasonable attorneys' fees, costs, and interest.

K.      That Plaintiffs be awarded punitive or exemplary damages in view of Defendant's reckless, willful, wanton acts committed with conscious disregard for the rights of Plaintiffs.

L.      That Plaintiffs have such other general and further relief as this Court deems just and proper.

Respectfully submitted, March 17, 2023.

                                        */s/Kennington R. Groff*
                                        Kennington R. Groff
                                        kgroff@founderslegal.com
                                        Zachary C. Eyster
                                        zeyster@founderslegal.com

                                        BEKIARES ELIEZER, LLP
                                        2870 Peachtree Rd. #512
                                        Atlanta GA 30305
                                        Telephone: 404.537.3686